UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL CASE NO. |
| | : | 3:24-CR-00112 (JCH) |
| v. | : | |
| | : | |
| MARKEYSE KELLY, JAQUAN PRICE, | : | FEBRUARY 18, 2025 |
| ROBERT COVINGTON | : | |
| Defendants. | : | |

**RULING ON MOTION TO SUPPRESS (DOC. NO. 54)**

**I.   INTRODUCTION**

Defendant Jaquan Price ("Mr. Price") is charged with Conspiracy to Possess with the Intent to Distribute Controlled Substances pursuant to sections 841(a)(1). 841(b)(1) and 846 of title 21 of the U.S. Code, Possession with Intent to Distribute under sections 841(a)(1) and 841(b)(1) of the same title, and Unlawful Possession of Ammunition by a Felon under sections 922(g)(1) and 924(a)(2) of title 18 of the U.S. Code.  Superseding Indictment (Doc. No. 33).  Mr. Price moves to suppress evidence obtained from 35 DeStafano Jr. Drive, Unit C, New Haven, Connecticut ("Apartment 35C").  Mr. Price argues the search of Apartment 35C violated his Fourth Amendment right to be free from unlawful searches and seizures because the Warrant authorizing the search lacked probable cause and was overbroad.  See Defendant's Memorandum in Support of Motion to Suppress ("Def.'s Mem.") (Doc. No. 54-1); Defendant's Reply Memorandum in Support of Motion to Suppress ("Def.'s Reply") (Doc. No. 97).  The government opposes this Motion.  See Government's Memorandum in Opposition to Motion to Suppress ("Gov'ts Opp'n") (Doc. No. 66)

For the reasons that follow, Mr. Price's Motion to Suppress is denied.

1

## II. BACKGROUND[1]

Members of the FBI's Street Gang Task Force ("Task Force") opened an investigation into a drug trafficking organization thought to involve Mr. Price. Master Affidavit ("Aff.") (Doc. No. 1-1) at ¶¶ 1, 3. Through a confidential informant, the government learned Mr. Price acted as a re-supplier of drugs and worked with Markeyse Kelly ("Mr. Kelly"). A confidential informant also reported that Mr. Price operated a separate operation selling pressed pills. Id. at ¶ 96. Officers observed Mr. Price and Mr. Kelly together nearly every day. Id. at ¶ 80. Mr. Price would regularly visit Mr. Kelly's apartment for short periods of time; this practice is consistent with the belief that the visits were done to restock their supply of illicit drugs. Id. For example, on February 14, 2024, police observed camera footage showing Mr. Price enter Mr. Kelly's apartment empty-handed and exit the apartment carrying a large reusable plastic bag. Id. at ¶ 79. Mr. Price had been released from state custody the same day, and officers believed Mr. Kelly gave Mr. Price drugs to sell in order to help Mr. Price earn an income. Id. at ¶ 78-79. As another example, on April 24, 2024, police observed camera footage that showed Mr. Price visiting an apartment associated with Mr. Kelly carrying a shoebox. Id. at ¶ 82. About two minutes after Mr. Price arrived, he left the apartment without the shoebox and left the area. Id.

Around March 23, 2024, a confidential informant working at the direction of the government sought to purchase illicit drugs from Mr. Kelly. Id. at ¶ 55. Mr. Kelly told the confidential information to pick up the drugs from Mr. Price. Id. On the way to Apartment 35C, the confidential informant contacted Mr. Kelly through Facebook video

---

[1] The court draws on the parties' filings and the Master Affidavit (Doc. No. 1-1) to summarizes the alleged facts relevant to this Ruling.

chat, and asked Mr. Kelly to ensure Mr. Price would have the drugs prepared upon the confidential informant's arrival. Id. at ¶ 56. The confidential informant went to Apartment 35C. See id. The apartment features a front and rear entrance, both of which open onto the street and are marked "35C". Aff. at ¶ 56; Aff., Attachment A-4. Once the confidential informant arrived, Mr. Price exited the Apartment 35C and gave the confidential informant seven "bricks". Aff. at ¶ 56. The "bricks" tested positive for fentanyl. Id. at ¶ 58.

On May 8, 2024, police observed an unknown visitor briefly enter Apartment 35C. Id. at ¶ 92. The person exited the apartment after three minutes and stood near the front door. Id. Next, someone inside the apartment, presumably standing near the doorway, and the unknown visitor appeared to conduct a hand-to-hand exchange. See id. The visitor left following the exchange. Id. Approximately 30 minutes after this exchange, police observed Mr. Price leaving the apartment. Id. Officers believed this exchange was a narcotics transaction. Id. at ¶ 94.

On May 9, 2024, police observed Mr. Price and Mr. Kelly make several trips, over the course of 20 minutes, between another apartment implicated in drug trafficking and a vehicle Mr. Price and Mr. Kelly were known to use. Id. at ¶ 86. The pair drove the vehicle to Apartment 35C, but in doing so, they traveled errantly, possibly to avoid police detection. Id. at ¶ 87. Later the same day, officers observed Mr. Price appear to retrieve something from the vehicle before returning to Apartment 35C. Id. at ¶ 90.

On May 10, 2024, another unknown visitor came to Apartment 35C. Id. at ¶ 93. The visitor was empty-handed upon his arrival, but when the visitor left Apartment 35C four minutes later, he appeared to be carrying a large object under his clothing. Id.

About one hour and ten minutes after this visit, officers observed Mr. Price leave Apartment 35C; it appeared as though he was carrying something in his sweatshirt pocket. Id. at ¶ 95.

United States Magistrate Judge Robert M. Spector issued a Search Warrant on May 13, 2024, having found probable cause on the basis of facts alleged in the Master Affidavit. See Search Warrant, 3:24-mj-432 (RMS) ("Search Warrant") (Doc. No. 10). The Search Warrant authorized police to search Mr. Price's apartment for, inter alia, illicit drugs, drug paraphernalia, firearms, ammunition, and cellphones. Id. Police executed the Search Warrant on May 14, 2024, in doing so, police discovered and seized illicit drugs, ammunition, and multiple cellphones, among other items. Def.'s Mem. at 7; Gov'ts Opp'n at 5-6. Mr. Price made statements to police, some of which were made after a Miranda warning, while police were executing the Warrant. Def.'s Mem. at 7, 25.

## III.  LEGAL STANDARD

Under the Fourth Amendment of the U.S. Constitution, "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The Supreme Court has explained "the probable-cause standard is a 'practical, nontechnical conception' that deals with 'the factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act.'" Maryland v. Pringle, 540 U.S. 366, 370 (2003) (quoting Illinois v. Gates, 462 U.S. 213, 231 (1983)). "Probable cause 'is a fluid concept' turning 'on the assessment of probabilities in particular factual contexts,' and as such is not 'readily, or even usefully, reduced to a neat set of legal rules.'" United States v. Raymonda, 780 F.3d 105, 113

4

(2d Cir. 2015) (quoting United States v. Falso, 544 F.3d 110, 117 (2d Cir.2008)).  In light of this "subjective standard, a reviewing court generally accords 'substantial deference to the finding of an issuing judicial officer that probable cause exists[.]'" Id. (quoting United States v. Wagner, 989 F.2d 69, 72 (2d Cir.1993)).  This court's inquiry is limited to "whether the [judicial] officer had a substantial basis for his determination.  Id. (internal quotation marks omitted).

## IV.    DISCUSSION

Mr. Price argues evidence seized as a result of the Search Warrant at issue should be suppressed, as should statements he made to police during the search, because the Warrant lacked probable cause.  See Def.'s Mem; Def.'s Reply.  This is so, according to Mr. Price, because, aside from conclusory statements, the Affidavit relies on uncorroborated and unreliable information provided by a confidential informant; invokes stale information; is based on illogical or unsupported assessments made by police; and connects Apartment 35C to drug trafficking activities in conclusory fashion.  Def.'s Mem. at 11-24; Def.'s Reply at 8–9.  In addition, Mr. Price argues the Search Warrant was overbroad.  Def.'s Mem. at 24.  The government opposes each of these arguments.  See Gov'ts Opp'n.  The court addresses each of these arguments.

### A.    Reliability of Confidential Informant

According to Mr. Price, the information provided by the confidential informant cannot establish probable cause because the Affidavit does not reflect that law enforcement corroborated all of the confidential informant's statements; did not supply a basis for certain of the confidential informant's assertions involving Mr. Price; and omitted information about the confidential informant that would allow a court to evaluate

5

the informant's credibility. Def.'s Mem. at 15–19; Def.'s Reply at 9–10. The government opposes these arguments. Gov'ts Opp'n at 23–27.

The court considers the totality of the circumstances when considering whether information provided by an informant establishes probable cause to issue a warrant. Gates, 462 U.S. at 230. In doing so, "[t]he only questions for the Court are whether the affiant's reliance on that informant was reasonable, and whether the Magistrate was fully informed of all necessary facts when she made her finding of probable cause for the issuance of the search warrant." United States v. Smith, 9 F.3d 1007, 1013 (2d Cir. 1993) (internal quotation marks omitted and cleaned up). Information provided by a confidential informant "may be sufficiently reliable to support a probable cause finding if the person providing the information has a track record of providing reliable information, or if it is corroborated in material respects by independent evidence." Wagner, 989 F.2d at 72. Importantly, "[i]f a substantial amount of information from an informant is shown to be reliable because of independent corroboration, then it is a permissible inference that the informant is reliable and that therefore other information that he provides, though uncorroborated, is also reliable." Id.

Mr. Price argues the Affidavit does not show law enforcement corroborated all of the confidential informant's statements. Def.'s Mem. at 16–20; Def.'s Reply at 9–10. However, the Affidavit includes numerous instances in which police corroborated information provided by the confidential informant. For example, police undertook ten controlled narcotics purchases using the confidential informant. In eight of the ten transactions, police observations or audio recordings confirmed the confidential informant's statement of events. See Aff. at ¶¶ 25, 31, 37, 42, 47, 53, 58, 64. In two

6

instances, the Affidavit does not indicate whether the confidential informant's summary of events was consistent with audio recordings or police observations. See id. at ¶¶ 71, 76. However, the Affiant represented that the confidential informant had not, to his knowledge, knowingly provided any false information. Id. at ¶ 20. Further, field tests of these two controlled purchases indicated the presence of drugs or were inconclusive. Id. at ¶¶ 71, 76.

According to Mr. Price, because the confidential informant was aware he was being observed by law enforcement and was subject to audio and video recording while undertaking controlled purchases, the court should discount the value of this corroborated information when considering the reliability of the confidential informant. Def.'s Mem. at 17–18; Def.'s Reply at 9–10. Notwithstanding Mr. Price's argument, the Second Circuit has explained a confidential informant's "participation in supervised drug purchases is powerful corroborative evidence for purposes of determining probable cause[.]" Wagner, 989 F.2d at 73 (relying on a confidential informant's participation in six controlled purchases) (emphasis added); accord Lotto v. Tendler, No. 3:21-CV-1417 (VLB), 2023 WL 130647, at *7 (D. Conn. Jan. 9, 2023). Mindful of the Second Circuit's view of supervised controlled purchases, the court considers the government's corroboration of events described by the confidential informant as bolstering the confidential informant's reliability. Accordingly, the court concludes the confidential informant provided sufficiently reliable information such that it could serve as a basis of probable cause in support of the Search Warrant at issue.

In Mr. Price's view, the Affidavit fails to provide a basis for the confidential informant's conclusion that Mr. Price sold pressed pills independent from the suspected

7

drug trafficking organization. Def.'s Mem. at 18. While the Affidavit does not explain how the confidential informant arrived at this belief, it does suggest Task Force members independently believed Mr. Price sold press pills and used the confidential informant to confirm this belief. See Aff. at ¶ 96 (explaining that law enforcement determined Mr. Price sells pressed pills via "physical surveillance" and that this belief was confirmed by the confidential informant). Mr. Price calls this confirmation "patently conclusory". Def.'s Mem. at 18. The court, however, considers it significant that the police independently formed the view that Mr. Price sold pills and relied on the confidential informant only to confirm their suspicion.

Applying similar reasoning, Mr. Price argues the Affidavit fails to provide a basis for the confidential informant's knowledge that Mr. Kelly gave Mr. Price narcotics to distribute following Mr. Price's release from custody on February 14, 2024. See Def.'s Mem. at 16. While the Affidavit does not provide a basis for the confidential informant's assertion, it does corroborate it. Indeed, the Affidavit describes that, on the day of Mr. Price's release from custody, officers observed Mr. Price enter an apartment associated with Mr. Kelly empty-handed and leave the apartment carrying a large reusable plastic bag. Aff. at ¶ 79. Officers inferred, on the basis of their professional training, that the bag contained narcotics. Id.

Mr. Price next argues that the Affidavit did not sufficiently divulge the confidential informant's criminal history, including details about pending state charges. Def.'s Mem. at 8–9; Def.'s Reply at 9. Officers may withhold information about a confidential informant's criminal history to protect his or her anonymity. United States v. Canfield, 212 F.3d 713, 719 (2d Cir. 2000). Accordingly, it is not fatal that the Affidavit omits

details about the confidential informant's criminal history, especially considering officers corroborated information offered by the informant. See Rivera v. United States, 928 F.2d 592, 604–05 (2d Cir. 1991) ("So long as law enforcement agents present adequate information to permit the magistrate to conclude that there is probable cause and do not suppress facts that would cast doubt on its existence, they may properly exclude information that would unduly risk revealing a confidential informant's identity[.]"); United States v. Soto, 52 F. App'x 534, 535 (2d Cir. 2002).

    In Mr. Price's view, it is also significant that the Affidavit does not disclose the amount the confidential informant was compensated for providing information to law enforcement. Def.'s Mem. at 9. Similarly, according to Mr. Price, the Affidavit does not describe the "nature, scope or duration" of the confidential informant's work with the Task Force. Id. Though the court cannot locate an explanation from Mr. Price about the significance of these omissions, it assumes Mr. Price would argue the omissions are problematic because the Magistrate Judge could not evaluate the reliability of the confidential informant without knowing these details. See id. While Mr. Price is correct that the Affidavit does not disclose details of the confidential informant's compensation, it does clearly state that the confidential informant was "monetarily compensated in exchange for information and services he provides to Law Enforcement." Aff. at ¶ 20. Contrary to Mr. Price's contention, the Affidavit explains that the confidential informant began working with the FBI in 2023, and recounts numerous instances in which the confidential informant relayed information to law enforcement. See Aff. at ¶¶ 21–76 (describing ten controlled narcotics purchases involving the confidential informant). While the 60-page Affidavit may not include certain specific details about the working

9

arrangement between the confidential informant and law enforcement, in the court's view, it provides sufficient information for a reviewing judge to consider the reliability of the confidential informant.  See Smith, 9 F.3d at 1013.

### B. Staleness of Information

According to Mr. Price, the Affidavit includes stale information relating to events that occurred in February and March 2024, and which improperly served as a basis for issuing the Search Warrant.  Def.'s Mem. at 14–17; Def.'s Reply at 4.

"[T]here is no bright line rule for staleness."  Wagner, 989 F.2d at 75.  Indeed, the Second Circuit instructs, "[f]acts of past criminal activity that by themselves are too stale can be sufficient if the affidavit also establishes a pattern of continuing criminal activity so there is reason to believe that the cited activity was probably not a one-time occurrence."  Id.  A paradigmatic example of such activities are narcotics conspiracies "for which courts have relaxed the temporal requirements of non-staleness."  Id. (internal quotation marks omitted).  Because the Affidavit suggests a pattern of continuing criminal activity in which Mr. Price was suspected of distributing drugs, including from Apartment 35C, the court does not agree with Mr. Price that allegations pertaining to his involvement in drug distribution in February and March 2024 are stale.  Instead, the allegations that Mr. Price sold drugs in February 2024 and sold drugs from Apartment 35C in March 2024 and May 2024, suggest the sort of ongoing drug conspiracy that lends support to the belief that he was using Apartment 35C as part of an ongoing narcotics operation.

### C. May 2024 Events

Mr. Price argues it is illogical to infer, as a Task Force member did, that a narcotics transaction occurred outside Apartment 35C on May 8, 2024, because it

would make more sense to conduct such a transaction inside the apartment. Def.'s Mem. at 22; Def.'s Reply at 8–9. In the court's view, police logically inferred a drug transaction occurred on May 8. Mr. Price provided several "bricks" containing narcotics to the confidential informant in front of the same apartment in March 2024. Aff. at ¶ 56. Indeed, Mr. Price argues and, as discussed below infra, the government concedes, the confidential informant never entered the apartment during the March 2024 transaction. Def.'s Mem. at 13–14; Gov'ts Opp'n at 15. Considering the assessment of the Task Force member, which is based on his or her law enforcement training and experience, in combination with the March 2024 controlled purchase, the Task Force member's assessment about the nature of the May 8 transaction is reasonable. See United States v. Dear, No. 3:20-CR-00057 (VLB), 2020 WL 7078728, at *6–*7 (D. Conn. Dec. 3, 2020), aff'd, No. 21-2833, 2023 WL 367880 (2d Cir. Jan. 24, 2023) (explaining that the training and experience of officers combined with other evidence established probable cause).

Mr. Price notes that officers did not observe Mr. Price transporting anything into, or out of, Apartment 35C on May 9, 2024, even though the Affidavit suggests he and Mr. Kelly did so that day. Def.'s Mem. at 21. Though police may not have observed Mr. Price carrying any objects between the vehicle and Apartment 35C, the Affidavit includes sufficient detail from which to reasonably infer Mr. Price retrieved something from a vehicle parked near Apartment 35C and brought it into the apartment. See Aff. at ¶ 90. While this may appear to be innocuous on its own, officers observed Mr. Kelly and Mr. Price shuttle between the vehicle and another apartment, that was thought to house narcotics, earlier in the day. Aff. at ¶¶ 86–87, 90. Considering the totality of the

circumstances, Mr. Price's movements support the inference that he was transporting items to Apartment 35C.

Mr. Price next observes the Affidavit does not include a photograph of the visitor entering the apartment on May 10, 2024, which makes it impossible to determine whether the bulge in the visitor's clothing upon leaving the apartment was present when the visitor arrived.  Def.'s Mem. at 22–23.  In the court's view, Mr. Price suggests no reason to disbelieve the veracity of the observations made by the Affiant.  Accordingly, while a comparison photograph would aid the court's review of the Affidavit, its absence does not seriously undermine it.

      D.      Nexus to Apartment 35C

The Affidavit must "establish a sufficient nexus between the criminal activities alleged" and the residence to be searched.  United States v. Singh, 390 F.3d 168, 182 (2d Cir. 2004).  Such a showing "does not require direct evidence and may be based on reasonable inference[s] from the facts presented based on common sense and experience."  Id. (internal quotation marks omitted).

In Mr. Price's view, the Affidavit does not sufficiently connect Apartment 35C to the alleged drug trafficking conspiracy such that a search warrant should have been issued.  Def.'s Mem. at 15.  Indeed, Mr. Price argues the "[A]ffidavit is devoid of any evidence of an observation of the presence of controlled substances inside Ap[artmen]t 35C."  Id.  Mr. Price asserts the Affidavit falsely indicates the confidential informant entered inside Apartment 35C during the March 2024 controlled purchase.  Id. at 15, 19.  That the confidential informant never entered Apartment 35C suggests to Mr. Price that the confidential informant never observed the presence of narcotics inside the apartment and undermines the reliability of the confidential informant.  See id.  The

Affidavit reads, in part, "[the] [confidential informant] took possession of the bricks of fentanyl before walking directly back inside [Apartment] 35C." Aff. at ¶ 56. The government concedes this description of events is inartfully drafted and should read that Mr. Price returned to Apartment 35C after giving the confidential informant the "bricks". Gov'ts Opp'n at 15.

Though the confidential informant may not have entered the apartment, the Affidavit clearly states Mr. Price "exited from the front door marked '35C'", whereupon the confidential informant "took possession of the bricks". Aff. at ¶ 56. Immediately thereafter, the confidential informant met with law enforcement who took the "bricks" from the confidential informant and searched the confidential informant for contraband, finding nothing. Id. at ¶ 57. The Affidavit reports the "bricks" tested positive for narcotics, xylazine and fentanyl. Id. at ¶ 58. Considering this controlled purchase in conjunction with the suspected May 2024 purchases, the Affidavit provides evidence establishing probable cause for the conclusion that narcotics would be found in the apartment in May 2024.

Mr. Price argues the Affidavit does not state the basis for the confidential informant's assertion Apartment 35C belong to Mr. Price. Def.'s Mem. at 12–13. That the Affidavit did not explain the basis for the confidential informant's belief that Apartment 35C belonged to Mr. Price is not of great significance because the Affidavit includes several descriptions of Mr. Price entering or exiting Apartment 35C, thereby lending support to the confidential informant's belief. E.g., Aff. at ¶ 56 (Mr. Price exited from a door marked "35C"); Aff. at ¶ 90 (Task Force members observed Mr. Price exiting Apartment 35C before re-entering the apartment moments later); Aff. at ¶ 92

13

(Task Force members observed Mr. Price leaving Apartment 35C 30 minutes after a suspected narcotics transaction occurred in front of the same apartment); Aff. at ¶ 95 (Mr. Price was observed leaving Apartment 35C possibly with an item concealed under his clothing).

Next, Mr. Price suggests the confidential informant's belief that Mr. Price distributes narcotics from Apartment 35C is "without value" because it does not explain how the confidential informant arrived at this belief. Def.'s Mem. at 18–19. As already explained, however, Task Force members observed suspected narcotics transactions in front of Apartment 35C, and the confidential informant obtained "bricks" in front of the same apartment. Aff. at ¶¶ 56, 92–93. These observed suspected transactions, and the controlled purchase, powerfully corroborate the confidential informant's belief that Apartment 35C was used to distribute narcotics.

Mr. Price next argues that, of the ten total controlled narcotics purchases orchestrated by the Task Force, only one involved Apartment 35C. Def.'s Mem. at 11–12. While true, the court concludes the Affidavit establishes a nexus between narcotics distribution and Apartment 35C. The confidential informant obtained "bricks" containing narcotics in front of Apartment 35C. Aff. at ¶ 56. Police observed what looked to them to be two separate drug transactions in front of Apartment 35C. Id. at ¶¶ 92–93. The confidential informant told police he believed Mr. Price stored narcotics in Apartment 35C. Id. at ¶ 96. Considering the totality of the circumstances, the court concludes the Affidavit established probable cause to believe evidence of criminal activity would be found in Apartment 35C. See United States v. Indelicato, 865 F.2d 1370 (2d Cir. 1989); United States v. Donald, 417 F. App'x 41, 43 (2d Cir. 2011) (summary order)

14

(observation of a drug transaction at the residence at issue, along with the scale of the drug operation, established probable cause to search the residence).

      E.      Remaining Arguments About Affidavit

Mr. Price observes law enforcement did not use pen registers or other similar techniques to obtain his "precise location", whereas officers did use such technology to track Mr. Kelly. Def.'s Mem. at 20. However, according to the Affidavit, officers did monitor Mr. Price's location through cameras and surveillance units. Aff. at ¶¶ 79-81, 92-93. Mr. Price offers no case law to suggest, and the court does not understand why, the use of different methods to surveil Mr. Price and Mr. Kelly is of legal significance.

According to Mr. Price, the Affidavit is misleading because it suggests the confidential informant sought methamphetamine. Def.'s Mem. at 9–10; see also Def.'s Reply at 8. While certain of the controlled purchases, none of which involved Apartment 35C, yielded narcotics containing methamphetamine, Mr. Price argues the drug was present in "exceedingly low" quantities. Id. at 10–11. The Affidavit is, at worst, vague about whether the confidential informant sought methamphetamine. It is clear, however, that the confidential informant received narcotics containing methamphetamine. E.g., Aff. at ¶¶ 42, 76. Whether the amount of methamphetamine contained in the narcotics was "exceedingly low", as Mr. Price claims, is of little consequence because possessing any amount of methamphetamine is unlawful. See United States v. Martinez, 54 F.3d 1040, 1043 (2d Cir. 1995) ("any amount of drugs, however small, will support a conviction"); accord United States v. Peters, 843 F. App'x 369, 373 (2d Cir. 2021) (summary order).

15

F.    Overbreadth of Search Warrant

Mr. Price argues that the Search Warrant was overbroad because it contained no particularized basis to seize cellphones from the apartment. Def.'s Mem. at 24; see also Def.'s Reply at 4–5. The court disagrees. The confidential informant used Facebook video chat to communicate with Mr. Kelly about the March 2024 transaction. Aff. at ¶ 55. The Affidavit contains seven other instances in which cellphones were used to conduct narcotics transactions involving other members of the supposed drug trafficking organization. Id. at ¶¶ 33, 39, 44, 49, 60, 66, 73 (Facebook video chat used in controlled purchases made on February 24, 2024, March 9, 2024, March 23, 2024, April 13, 2024, April 18, 2024, and May 4, 2024). While these other instances do not necessarily involve Mr. Price, officers reasonably believed Mr. Price was operating as part of a larger drug trafficking organization. Aff. at ¶ 8. Thus, it would be reasonable to infer that Mr. Price used the methods of his alleged co-conspirators and communicated about narcotics transactions using a cellphone.

Having considered all of Mr. Price's arguments to the contrary, the court concludes the Affidavit established probable cause to conclude evidence of drug trafficking would be found inside Apartment 35C at the time the Search Warrant was issued.

G.    Statements to Police

According to Mr. Price, the statements he made to law enforcement should be suppressed. Def.'s Mem. at 25. Mr. Price argues that he made these statements, some of which he made after a Miranda warning, during an unlawful search and the statements regarded the whereabouts of items for which law enforcement were

searching. Id. Because the search was unlawful, according to Mr. Price, the statements amount to fruit of the poisonous tree and must be suppressed.

For the reasons the court has already explained, see, supra, part IV.A–F, the court concludes the search of Apartment 35C was lawful. Accordingly, there is no reason to suppress Mr. Price's statements as fruit of the poisonous tree. The court denies Mr. Price's Motion to Suppress evidence collected during the search at issue.[2] This includes statements Mr. Price made to officers during the search.

## V. CONCLUSION

For the reasons stated above, the court denies the defendant's Motion to Suppress (Doc. No. 54).

**SO ORDERED.**

Dated at New Haven, Connecticut this 18th day of February 2025.

          /s/ Janet C. Hall
          Janet C. Hall
          United States District Judge

---

[2] While the court concludes the Affidavit establishes probable cause, even if this assessment is incorrect, the good faith exception would foreclose suppression of evidence obtained from the search. Evidence will not be suppressed when, "an officer genuinely believes that he has obtained a valid warrant from a magistrate and executes that warrant in good faith[.]" United States v. Raymonda, 780 F.3d 105, 118 (2d Cir. 2015). An officer acts in good faith when the officer's reliance on the Search Warrant is objectively reasonable. Absent exceptions seemingly not at issue here, "the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or, as we have sometimes put it, in objective good faith." Messerschmidt v. Millender, 565 U.S. 535, 546, 132 S. Ct. 1235, 1245, 182 L. Ed. 2d 47 (2012) (internal quotation marks omitted).